**DIENER BRICK COMPANY, Appellee,**

v.

**MASTRO MASONRY CONTRACTOR and Ernest Bock & Sons, Inc., and XL Specialty Insurance Company and Joseph Russo.**

Appeal of: Ernest Bock & Sons, Inc.

Diener Brick Company, Appellee,

v.

Mastro Masonry Contractor and Ernest Bock & Sons, Inc., and XL Specialty Insurance Company

v.

Joseph Russo.

Appeal of: XL Specialty Insurance Company.

Appeal of: Ernest Bock & Sons, Inc.

Superior Court of Pennsylvania.

Argued July 28, 2005.

Filed Oct. 21, 2005.

---

Blaik P. Ross, Huntingdon Valley, for Ernest Bock & Sons.

Anton G. Marzano, Philadelphia, for Diener Brick.

John Palladino, Atlantic City, NJ, for XL Specialty Insurance.

BEFORE: MUSMANNO, GANTMAN and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Ernest Bock & Sons (Bock), and XL Specialty Insurance Company (XL), appeal from the December 23, 2004 judgment entered on the verdict rendered in favor of Diener Brick Company (Diener) at the conclusion of a non-jury trial. Bock also appeals from the February 14, 2005 Order in which the court granted Diener's petition for counsel fees and costs.

¶ 2 The underlying breach of contract action was initiated by Diener, a brick supplier, against Bock, the general contractor on a New Jersey construction project, XL Specialty Insurance Company (XL), bond issuer for the project, and Mastro Masonry Contractor, the masonry contractor,[1] to recover payment for bricks and supplies that Diener provided to the project. Following a non-jury trial, the court entered judgment on the verdict, molded to $192,999.27, in Diener's favor.[2] The court found that Bock, Diener, and Mastro had entered into a "joint-payee" agreement,[3] and that under the agreement,

---

1. Mastro Masonry Contractor is not a party to the appeal.

2. This amount includes the original December 19, 2004 judgment of $183,808.83, plus $9,190.44 in pre- and post-judgment interest at a rate of 5 percent (5%).

3. The court referred to the agreement as a "joint-payee agreement" in its December 17, 2003 Memorandum. The title of the actual agreement is "Joint Check Agreement." *See* Record No. 1, Complaint, Joint Check Agreement (attachment). These terms are interchangeable.

A "joint-payee" agreement is an instrumentality specific to the construction industry, in which one contractor enters into an agreement calling for it to write a check jointly payable to two other contractors. Pursuant to the agreement, one of the contractors then takes from the check only so much to pay his labor costs and dedicates the remainder of the check to pay for supplies obtained by the other contractors. *See* Record No. 16, Trial Court Memorandum, 12/17/03, Cohen, J., at 1.

By way of further background, we note the following:

As commonly used in the construction industry, a joint check arrangement provides that the general contractor will issue the progress payments to the subcontractor and its material suppliers.

Joint check arrangements may be initiated by parties at the top or bottom of the contract claim. For example, the general contractor may wish to insure that the party receiving the check (e.g., the subcontractor) will properly disburse the proceeds of the check to his supplier or subcontractors. In this manner the general contractor reduces the chances that his subcontractor will pocket the money and leave the supplier unpaid, thus provoking the supplier to file mechanic's liens or make claims against the general contractor's payment bond. Similarly, the supplier or sub-subcontractor may initiate the joint check arrangement to make sure that the subcontractor won't run off with the progress payments and leave him out in the cold. The supplier may desire this arrangement because the subcontractor is in financial trouble or lacks assets, or because he has never done business with the subcontractor before. Sometimes, the supplier will request a joint check arrangement out of simple mistrust of him.

In order to induce a supplier to deal with a subcontractor whose credit is questionable,

Bock, as the general contractor, was the issuer of checks jointly payable to Diener, enabling it to supply bricks, and Mastro, enabling it to meet its costs while being assured of supplies. The court found that, pursuant to the agreement, Diener looked to Bock for payment of bricks delivered to the project, and that Bock was to reserve at least $250,000 from its subcontract with Mastro for this purpose. Although the court concluded Bock was obliged to pay Diener for bricks delivered to the project, it found Bock had honored some invoices but that $183,808.83 remained unpaid. Both Bock and XL filed timely appeals from the December 23, 2004 judgment.

¶ 3 Thereafter, on February 14, 2005, the court entered an Order granting Diener's petition for counsel fees and costs related to the defense of Bock's counterclaim for tortious interference with prospective contracts. The court found Bock's counterclaim to be frivolous and vexatious, and thus ordered the defendants to pay $9,747.27 to Diener's law firm.[4] Bock also filed an appeal from this Order. The appeals were consolidated.

¶ 4 Bock raises the following issues:

1. Is a Pennsylvania general contractor protected under the safe harbor provisions of the Pennsylvania Procurement Code's Prompt Pay Act on a New Jersey public works project, from a claim by a supplier to one of the general contractor's subcontractors, when the general contractor paid the subcontractor in full and timely under its contract with that subcontractor?

2. Whether entry of a judgment in favor of a supplier and against a general contractor on a theory of unjust enrichment is proper, even though an express contract was found to exist between the supplier and general contractor and even though testimony and evidence proved that the general contractor had already paid its subcontractor in full[?]

3. Whether entry of a judgment in favor of a supplier and against a general contractor for the full amount of the supplier's claim is proper, even though such award would allow for the supplier to recover more than what the contract between the parties allowed for and an amount in excess of the contract's express cap on potential liability of the general contractor[?]

4. Whether entry of a judgment in favor of a supplier and against a general contractor for attorney's fees and costs as related to the supplier's defense of the general contractor's counterclaim business interference is proper, even though the evidence and testimony establishes that the general contractor's counterclaim was in good faith and compulsory and the only element of the counterclaim which could not be proved was the exact monetary damages [?]

Bock's brief at 6. XL raises the following issues:

1. Whether the trial court erred in concluding that, under New Jersey Bond Act, N.J.S.A. 2A:44–145 et seq., the Joint Check Agreement constituted a direct contract between Diener Brick Company and Ernest Bock & Sons, Inc., thereby

---

the general contractor may agree to pay the subcontractor with checks payable to the joint order of the subcontractor and the supplier. The subcontractor endorses the checks and turns them over to the supplier. The supplier then deducts the amount owed for materials, and returns the balance.

*Glen–Gery Corp. v. Warfel Constr. Co.*, 734 A.2d 926, 929 (Pa.Super.1999) (citations omitted). We note that here, Mastro, the subcontractor, ultimately did go out of business.

4. This amount included $7,290.00 for attorneys' fees and $2,457.66 for costs.

holding XL Specialty Insurance Company liable to Diener?

2. Whether the trial court erred in concluding that, under New Jersey Bond Act, N.J.S.A. 2A:44–145 *et seq.*, the Joint Check Agreement otherwise obligated Ernest Bock & Sons, Inc., as to Diener Brick Company, thereby holding XL Specialty Insurance Company liable to Diener?

3. Whether, assuming arguendo the Joint Check Agreement imposed liability on Ernest Bock & Sons and XL Specialty Insurance as to Diener, the trial court erred in concluding the liability extended beyond the Cap in the Joint Check Agreement?

XL's brief at 3. We address these issues *seriatim.*

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Amerikohl Mining Co. v. Peoples Natural Gas Co.,* 860 A.2d 547, 549–550 (Pa.Super.2004), *appeal denied,* 583 Pa. 667, 876 A.2d 392 (2005) (citations omitted).

¶ 5 As to the first issue, Bock agrees with the court that Pennsylvania law applies to this case. Thus, Bock argues, the Pennsylvania Procurement Code and the Prompt Pay Act[5] applies and its "safe harbor" provisions preclude Diener's suit, since once a contractor (Bock) pays a subcontractor (Mastro), suits by the subcontractors' subcontractor (Diener) against the general contractor (Bock) or his surety (XL) are barred. Bock contends it paid its masonry subcontractor Mastro within fourteen days, as required by statute, thus Diener cannot recover from Bock. Further, despite the fact appellant is a Pennsylvania Corporation doing business in New Jersey on a public construction project (a school), the Act applies and protects Bock.

¶ 6 We first note that although Diener concedes that Bock pled the defense as new matter in its answer to the complaint, Diener argues this claim is waived because Bock allegedly failed to raise the defense with the trial court and failed to include it in its post-trial motions and supporting briefs. Bock argues that it did not mention the Prompt Pay Act in its post trial motion, but it raised the essential elements necessary for protection under the Act. Bock adds that in addition to raising the issue in its answer and new matter, it also raised this issue in its statement of matters complained of on appeal.[6]

¶ 7 We agree that this issue is waived. It is well-established that issues not raised in post trial motions are waived for purposes of appeal. Pa.R.Civ.P. 227.1; *See also Diamond Reo Truck Co. v. Mid-Pacific Indus.,* 806 A.2d 423, 428 (Pa.Super.2002) *citing Hall v. Owens Corning,* 779 A.2d 1167, 1169 (Pa.Super.2001); *see also Lane Enters. v. L.B. Foster Co.,* 551 Pa. 306, 710 A.2d 54 (1998); *L.B. Foster Co. v. Lane Enters.,* 551 Pa. 307, 710 A.2d

---

**5.** 62 Pa.C.S.A. § 3901 *et seq.*

**6.** We note that the only copy of Bock's statement of matters complained of on appeal is in the reproduced record attached to its brief.

In that reproduction, the claim in fact is raised. We further note that XL raised the claim in its statement of matters complained of on appeal. *See* Record No. 27, para. 40.

55 (1998). As the *Diamond Reo* Court explained, post-trial motions are filed when the court still has jurisdiction to correct the asserted errors "at that early stage without necessitating the expenditure of time and judicial energy in taking a costly appeal to the appellate courts." *Diamond Reo,* at 430 (citation omitted). The court apparently did not review the issue of the Prompt Pay Act, and thus did not have the opportunity to correct any purported errors there under. We therefore cannot review the court's holding on the matter. In addition, the filing of a 1925(b) statement raising the issue is not an adequate substitute for the raising of the issue in post-trial motions. *See id.,* at 430. A 1925(b) statement is filed after an appeal is filed, when the court no longer has jurisdiction over the matter. *Id.* Because Bock failed to properly raise this issue in a post-trial motion, this issue has not been preserved and we may not review it.

▌ ¶ 8 In any event, Bock claims it is protected under the "safe harbor" provision of the Prompt Pay Act which states, in pertinent part,

> Once a contractor has made payment to the subcontractor... future claims for payment against the contractor or the contractor's surety by parties owed payment from the subcontractor which has been paid shall be barred.

62 Pa.C.S.A. § 3939(b).

¶ 9 Assuming *arguendo* that the Act applies, we agree with the trial court that, in executing the joint check agreement, a direct duty was created on Bock's behalf to pay Diener. Accordingly, Bock would not be protected by virtue of its timely payment to Mastro.

¶ 10 Next, Bock argues that to the extent that the lower court's award was based upon a theory of unjust enrichment, it was improper because (1) the court found that an express contract, the joint check agreement, existed between the parties; (2) Bock paid subcontractor Mastro in full, and thus cannot be unjustly enriched; and finally (3) because some of the materials for which Diener sought payment were never delivered or incorporated into the project, thus no benefit was conferred.

▌ ¶ 11 It is true that "[a] cause of action for unjust enrichment may arise *only* when a transaction of the parties *not otherwise governed by an express contract* confers a benefit on the defendant to the plaintiff's detriment without any corresponding exchange of value." *Villoresi v. Femminella,* 856 A.2d 78, 84 (Pa.Super.2004), *appeal denied,* 582 Pa. 719, 872 A.2d 1200 (2005) (emphasis supplied); *accord Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.,* 832 A.2d 501 (Pa.Super.2003), *appeal denied,* 577 Pa. 724, 847 A.2d 1288 (2004); *see also Mitchell v. Moore,* 729 A.2d 1200 (Pa.Super.1999) (reiterating that "we may not make a finding of unjust enrichment... where a written or express contract between parties exists"). As the learned Professor John E. Murray explained, unjust enrichment is applicable where "no real promises and none of the other elements of a real contract is present." Murray on Contracts, 3rd Edition, § 19, at 35.

▌ ¶ 12 Here, the extent to which the court relied on the theory of unjust enrichment is a bit unclear. We note that in its Memorandum filed December 17, 2003, the court "adopted the wisdom of the Superior Court in *Glen–Gery Corp. v. Warfel Constr. Co.,* 734 A.2d 926 (Pa.Super.1999)." Trial Court Memorandum, Cohen, J., 12/17/03, at 2. The facts of *Glen–Gery* are very similar to the facts here. A general contractor entered into a joint check agreement with a masonry/architectural subcontractor and a brick supplier. The

*Glen–Gery* Court concluded that the agreement was clear and unambiguous and thus looked to its express language to determine the intent of the parties. The expressed intent was that the general contractor was to compensate the brick supplier for project materials supplied. As such, the joint check agreement modified the standard subcontract provision, and created a direct duty on the general contractor's part to pay the brick supplier for the project supplies. It is quite clear that the court here found an express contract between the parties in the joint check agreement. Trial Court Memorandum, Cohen, J., 12/17/03, at 1–3. This finding is exemplified in the court's statement that "[h]ere there are unpaid invoices that must, *pursuant to the contract,* be paid." *Id.,* at 3 (emphasis supplied). The court then goes on to state, "[f]or Bock to have enjoyed the benefit of the brick supplies and failed to pay is unjust enrichment." *Id.* We conclude that the court's use of the term "unjust enrichment" here is not an indication that it relied on that theory in its disposition of this issue, but rather an unfortunate use of a term of art which added a slight bit of confusion to an otherwise very clear disposition of the issue.

¶ 13 The court also mentions unjust enrichment in its Opinion dated February 14, 2005. At this point, some background information is necessary. The joint check agreement provides that "[t]otal material cost is not to exceed $250,000." *See* Record No. 1, Complaint, Joint Check Agreement (attachment). Both Bock and XL have argued that the court erred in awarding Diener $183,808.83 because Bock had already paid $99,756.06. This, according to Bock, amounts to a total reimbursement to Diener of $283,564.89, for an excess of

$33,564.89 over what Bock characterizes as the contract "cap" of $250,000.[7]

¶ 14 The court explained:

While this is a factual matter, it may require some clarification at the appellate level. The reason the Court awarded damages on all the outstanding invoices to the extent that the total exceeded the putative limit of $250,000 set forth in the joint check agreement was because defendant Bock admitted in trial that it paid other vendors in excess who were involved in the [project]. It was also established that the brick ordered by Diener was incorporated into the project, thus laying the groundwork for an unjust enrichment claim the value of which had to be folded into the overall damages.

Trial Court Opinion, Cohen, J., 2/14/05 at 5. Accordingly, it seems that the court based its award, in part, on a theory akin to a "course of performance" or "course of dealing" modification to the contract.

"Course of dealing" is a "sequence of previous conduct *between the parties* which is fairly regarded as establishing a common basis of understanding for interpreting their expressions and other conduct". "Course of performance" is a sequence of conduct *between the parties* subsequent to formation of the contract during performance of the terms of the contract.

*J.W.S. Delavau v. E. Am. Transp. & Warehousing,* 810 A.2d 672, 683–684 (Pa.Super.2002) (citations omitted, emphasis supplied). Neither theory is applicable here since the conduct to which the court refers, i.e. that Bock paid other vendors involved in the project in excess, was not *between the parties* to the joint check

---

7.  Both Bock and XL question the propriety of an award in excess of the "cap." Thus, we note that our discussion here is pertinent to both Bock's second and third issues on appeal, and XL's third issue.

agreement. It is unclear under what theory of contract law Bock's conduct as to other vendors involved in the project relates to the express terms of the express contract between these parties.

¶ 15 The court also made clear that its award was also based in part upon a theory of unjust enrichment. As stated above, recovery based upon a theory of unjust enrichment is precluded where there exists an express contract between the parties. *See e.g., Mitchell v. Moore,* 729 A.2d 1200 (Pa.Super.1999).

¶ 16 We note that the parties and the court appear to be in agreement that the $250,000 was intended to be a cap on Bock's liability. In fact, the contract language that "[t]otal material cost is not to exceed $250,000" is unambiguous.[8] We therefore cannot look to extrinsic evidence to give this provision another interpretation. *See Glen–Gery Corp., supra.,* 734 A.2d at 931. "The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." *Id.,* at 929. "This Court will not rewrite the terms of a contract, nor give them meaning that conflicts with that of the language used." *Id.*

¶ 17 Based on the above, we conclude there was no proper basis for the court to award an amount that would result in Diener recovering in excess of $250,000 on the contract. The verdict must be molded accordingly.[9]

¶ 18 We note that as part of Bock's argument that any award in excess of $250,000 is inappropriate, Bock argues that Diener was inappropriately awarded $17,000 for brick that was never delivered to the project or incorporated therein. Bock's brief at 28. As Diener points out, however, this brick was special-made and Diener has been unable to sell it to any other customer, and Diener remains liable to the manufacturer. N.T., 11/10/03, at 59–61. Accordingly, we find the court's inclusion of this invoice in the award to be proper, to the extent that the award does not exceed the $250,000 maximum.

■ ¶ 19 Finally, Bock argues that entry of a judgment in favor of Diener and against Bock for attorney's fees and costs related to Diener's defense of Bock's business interference counterclaim is improper, because evidence and testimony established that Bock's counterclaim was in good faith and compulsory, and the only element of the counterclaim which could not be proved was the exact monetary damages.

¶ 20 Our standard of review is deferential. The decision to award attorneys' fees incurred in bringing an action is within the discretion of the trial court, and we will reverse a trial court's decision on the matter only in the event of a palpable abuse of discretion. *Thunberg v. Strause,* 545 Pa. 607, 614–615 682 A.2d 295, 299 (1996). "If

8. We note that immediately after the provision stating that "Total material cost is not to exceed $250,000," there exists what is evidently a modification after-the-fact, stating that "authorized add ons are part of this agreement." *See* Record No. 1, Complaint, Joint Check Agreement (attachment). Although we may have considered this to add some ambiguity to otherwise unambiguous language as to whether the $250,000 was an absolute cap, the record indicates that latter addition was a unilateral attempt by Diener to modify the agreement, and Bock never initialed the changes. *See* N.T., 11/10/03, at 14.

9. We note that based upon our holding that Diener cannot recover under a theory of unjust enrichment, we need not address the issues Bock raises arguing that unjust enrichment does not apply because Bock paid Mastro in full, and that an award based upon unjust enrichment must be reduced by the $17,000 worth of specialty brick which was not delivered to or incorporated into the project. Bock's brief at 26–27.

the record supports a trial court's finding of fact that a litigant violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal." *Id.* After a review of extant case law on the issue of attorney's fees, this Court provided the following synopsis:

> (1) That an award of counsel fees is intended as a sanction against those who seek to use legal avenues to harass other parties, or attempt to obtain a benefit to which they would not otherwise be legally entitled.
>
> (2) That a decision rendered by a trial judge on the issue of counsel fees should not be overturned unless compelling reasons exist to do so.

*Berg v. Georgetown Builders, Inc.*, 822 A.2d 810, 818–819 (Pa.Super.2003).

¶ 21 It is clear that the court awarded attorneys' fees to Diener because Bock sought to withdraw the counterclaim just before trial. *See* Trial Court Opinion, Cohen, J., 2/14/05, at 6–7; *see also* Trial Court Memorandum, 12/17/03, at 3. The court explained that at the commencement of Bock's case, Bock moved to withdraw, without prejudice, its counterclaim for business interference because it did not have a dollar figure as to damages. Diener opposed Bock's motion, arguing that Bock had nine months since filing the counterclaim to "flush out their claims." Trial Court Opinion, Cohen, J., 2/14/05, at 6. The court noted that Bock had ample time to withdraw the counterclaim but instead persisted with it, and, in doing so, exhibited conduct that was "frivolous" and "vexatious." *Id.*, at 6–7; *see also* Trial Court Memorandum, 12/17/03, at 3. It therefore entered a *non pros* in Diener's favor.

¶ 22 In entering this award, the trial court relied upon 42 Pa.C.S.A. § 2503, **Right of participants to receive counsel fees**, subsections (7) and (9) which provide, respectively, that a trial court may award reasonable counsel fees to a litigant as a sanction for conduct that is dilatory, obdurate or vexatious, and for conduct in commencing the matter or otherwise, that is arbitrary, vexatious, or in bad faith.

> An opponent's conduct has been deemed to be "arbitrary" within the meaning of the statute if such conduct is based on random or convenient selection or choice rather than on reason or nature. An opponent also can be deemed to have brought suit "vexatiously" if he filed the suit without sufficient grounds in either law or in fact and if the suit served the sole purpose of causing annoyance.

*Berg*, at 816 (citations omitted). Also, "[p]arties have been found to have acted 'vexatiously' when they have pursued their claim in the face of settled law or in contravention of clear court rulings that their claim was without merit." *Id.*, at 821. "Finally, an opponent can be charged with filing a lawsuit in "bad faith" if he filed the suit for purposes of fraud, dishonesty or corruption." *Id.*, at 816.

¶ 23 Bock's counterclaim was for tortious interference with prospective contracts.

> [C]ommon law has recognized an action in tort for an intentional, unprivileged interference with contractual relations. It is generally recognized that one has the right to pursue his business relations or employment free from interference on the part of other persons except where such interference is justified or constitutes an exercise of an absolute right.
>
> · · ·
>
> The elements of this tort of inducing breach of contract or refusal to deal,

which must be averred in the complaint, ... one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby. In other words, the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 429, 393 A.2d 1175, 1182 (1978) (Citations omitted). Diener alleges Bock had no cause of action because the contracts to which it is referring were between its subcontractors and other suppliers, not between Bock and other suppliers. Bock's counterclaim specifically alleges, however, that none of the suppliers would supply bricks to EBS, i.e. Earnest Bock & Sons. Record No. 5, Answer and Counterclaim, at 9, para. 67. Further, Bock would likely be a third party beneficiary to any contracts between its subcontractors and their suppliers. This Court knows of no extant case law which suggests that Bock's claim could be of no merit. Further, we have found no cases, and the court has cited none, to support the principle that a party who waits until the start of trial to seek withdrawal of a claim has exhibited conduct worthy of the sanction of imposition of counsel fees.

¶ 24 It is important to remember that there is apparently no dispute that Bock paid *Mastro,* the subcontractor, in full, for masonry supplies delivered to the project. More supplies were needed. Bock contends it tried to acquire these supplies, but due to Diener's alleged conduct in refusing to supply more brick to Bock or its subcontractors, probably based upon the fact that

it had not received full payment for supplies already provided, and in allegedly contacting other suppliers and persuading them not to supply to Bock or its subcontractors, Bock encountered a delay which allegedly caused it harm.[10] Record No. 5, Complaint, at 9–10. Common sense tells us that a delay in a construction project would cause harm. Bock was unable to assess its damages by trial, allegedly due to the project owner's delay in assessing damages. Bock's brief at 32. Although Bock's claim may not have been a strong one and it may not have been able to prove its case, the record does not indicate that Bock did not reasonably believe its claim was valid under existing or developing law. *See Berg, supra,* at 818, *citing Santilo v. Robinson,* 383 Pa.Super. 604, 557 A.2d 416 (1989). Although by the time of trial, Bock was unable to measure its purported damages, "[a]ctions are not brought only where there is certain proof of liability and damages." *Id.*

¶ 25 Although the standard of review applicable to an award of counsel fees is deferential, we find the court did abuse its discretion in its award in Diener's favor. We find no basis in law or fact upon which to conclude that Bock's conduct was frivolous or vexatious. For the above stated reasons, we conclude that the award of counsel fees must be vacated.

■ ¶ 26 Diener claims that pursuant to local rule of Philadelphia County 227.5(B), costs are allowed to the prevailing party in whose favor judgment is entered. In pertinent part, Rule 227.5 **Bill of Costs,** (B) **Parties entitled,** states,

Costs shall be allowed to a prevailing party except as otherwise provided by law... A prevailing party shall include:

(1) A party in whose favor a final judgment is entered.

10. We note that Diener denies this alleged conduct. *See* Record No. 9.

(2) A party in favor of whom a *non pros* is entered.

(3) Defendants for whom judgment is entered, or who are dismissed from the action, even though the plaintiff ultimately prevails over the remaining defendants.

We outright reject as disingenuous Bock's argument that the court could not award costs because the court's December 17, 2003 and December 23, 2004 Orders state that Diener could file a petition for attorneys' fees limited to legal work expended in the defense of the counterclaim, but those Orders did not allow specifically for Diener to recover costs. The court clearly was attempting to limit its award of counsel fees to that which was expended in the defense of the counterclaim, but the court in no way precluded the award of costs. Diener argues that as to Bock's counterclaim, since a *non pros* and final judgment was entered in its favor, it is entitled to the related costs. We agree.

■ ¶ 27 Two of XL's issues remain to be addressed. Upon examination of the argument section of XL's brief, it is clear we can address these issues as one. XL first asserts the court erred in concluding that, under New Jersey Bond Act, N.J.S.A. 2A:44–145 *et seq*, the joint check agreement constituted a direct contract between Diener and Bock, thereby holding XL liable to Diener.

¶ 28 We begin review of this issue by noting that the court applied Pennsylvania law in its disposition of this case, except that the court analyzed New Jersey bond law in the interpretation of the application of the bonding provisions. *See* Trial Court Memorandum, Cohen, J., 12/17/03, at 2–3; *see also* Trial Court Opinion, Cohen, J., 2/14/05, at 3–4.

¶ 29 XL cites the following as a pertinent provision of the New Jersey Bond Act:

Any person who may be a beneficiary of the payment bond, as defined in this article, and *who does not have a direct contract with the contractor furnishing the bond shall, prior to commencing any work, provide written notice to the contractor* by certified mail or otherwise, provided that he shall have proof of delivery of same, that said person is a beneficiary of the bond. If a beneficiary fails to provide the required written notice, *the beneficiary shall only have rights to the benefits available hereunder from the date the notice is provided.*

N.J.S.A. 2A:44–145 (emphasis supplied). XL then goes on to cite the New Jersey case of *Dial Block Co., Inc. v. Mastro Masonry Contractors*, 374 N.J.Super. 13, 863 A.2d 373 (2004), in which the New Jersey Superior Court interpreted the New Jersey Bond Act to determine whether a joint check agreement was a "direct contract" under the Act, as authority that the contract between Bock and Diener was not a direct contract between the two, thus notice was required under the Act. It is noteworthy that the *Dial Block* court relied upon federal case law interpreting the Miller Act, 40 U.S.C.A. § 3131 *et seq.*, which is said to be analogous to New Jersey bond law. That case law, specifically the case of *U.S. ex rel. St. Elec. Supply Co., Inc. v. Hesselden Constr. Co.*, 404 F.2d 774 (10th Cir.1968), upon which the *Dial Block* court relied heavily, found that, pursuant to the joint check agreement at issue, the general contractor did not agree to be responsible for payment for the materials supplied, but rather merely agreed to make further payments by joint checks. *Dial Block*, at 378–370. The *Dial Block* court found that the same reasoning applied to the facts there, i.e., at no time did the general contractor agree to become obligated to pay the supplier. *Id.*, at 379. The language of the joint check agreement

here is very different, and we concur with the trial court that the plain language of the joint check agreement obligated Bock to pay Diener. Accordingly, the *Dial Block* case is not controlling. Pennsylvania case law makes clear that a joint check agreement can, in fact, create a direct contract between the general contractor and the supplier. *See Glen–Gery Corp. supra.* Our facts and our holding are akin to *Glen–Gery,* in which it was determined that the joint check agreement did create a "direct duty" on the general contractor's behalf to pay the supplier.[11] Based upon this finding, the cited provision of the New Jersey Bond Act is inapplicable. It is therefore irrelevant whether Diener provided notice as required under that Act. Based upon the above, XL's claims under the New Jersey Bond Act must fail.

¶ 30 The December 23, 2004 judgment is affirmed up to the contract "cap" of $250,000. That portion of the judgment above the "cap," that is, $33,564.89, is vacated; the award must be adjusted to $150,243.94 ($183,808.83 minus $33,564.89). The award of $9,190.44 in pre- and post-judgment interest is vacated; it must be recalculated, at a rate of 5%, based upon the adjusted judgment of $150,243.94.

¶ 31 The February 14, 2005 Order awarding counsel fees and costs is affirmed in part and vacated in part. The award of counsel fees in the amount of $7,290 is vacated; the award of costs in the amount of $2,457.66 is affirmed.

¶ 32 Jurisdiction relinquished.

¶ 33 Judge MUSMANNO concurs in the result.

---

11. We note that just as Bock argues that *Glen–Gery* does not dictate that every joint check agreement creates a direct contract between the general contractor and supplier, *Dial Block* does not preclude a direct contract in every case.